IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF MORAN PHILADELPHIA, DIVISION OF MORAN TOWING CORPORATION, AS OWNER AND OPERATOR OF THE TUG CAPE COD | CIVIL ACTION NO. 14-7079 |

## OPINION

**Slomsky, J.**                                                          **March 31, 2016**

### I.  INTRODUCTION

This admiralty case involves a barge crane owned by Rhoads Industries, Inc. ("Rhoads") that was damaged in the Port of Philadelphia while it was being moved by a tug boat owned and operated by Moran Towing Corporation on November 9, 2012.  This Court has subject matter jurisdiction over this admiralty and maritime case pursuant to 28 U.S.C. § 1333.[1]  It has been divided into two phases at the request of the parties, with the first and current phase addressing the applicability of the Schedule of Rates, Terms and Conditions, including a limitation of liability provision, that is published online by Moran Towing Corporation ("Moran").[2]  The second phase will encompass all remaining discovery and liability issues.

Moran has moved for Partial Summary Judgment seeking a determination that the Schedule of Rates, Terms and Conditions applies to the services provided by Moran's tugboat

---

[1]  28 U.S.C. § 1333 provides that: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled. . . ."

[2]  Moran Towing Corporation is a New York corporation with an office and principal place of business in Connecticut.  (Doc. No. 1 ¶ 1.)  Moran Towing Corporation operates along the Delaware River and in the Port of Philadelphia under the name Moran Philadelphia, Division Of Moran Towing Corporation.  (Id.)  For purposes of this Opinion, Moran Philadelphia and Moran Towing Corporation are referred to as "Moran."

which resulted in the allision.[3]   (Doc. No. 33.)   Rhoads filed a Response in Opposition to the

Motion, arguing that the Schedule does not apply.   (Doc. No. 36.)   Moran filed a Reply to the

Response.   (Doc. No. 37.)   For reasons that follow, Moran's Motion for Partial Summary

Judgment (Doc. No. 33) will be granted.

## II.   FACTUAL BACKGROUND

The following facts are taken from the agreed upon Statement of Facts (Doc. Nos. 33,

35), as well as deposition testimony and documents attached to the summary judgment filings.

### A.   The Parties

Moran is engaged in the towing business, and currently operates in sixteen ports along

the East and Gulf Coasts of the United States.   (Doc. Nos. 33, 35 ¶ 1.)   It operates along the

Delaware River and in the Port of Philadelphia under the name Moran Philadelphia, Division of

Moran Towing Corporation, and has a place of business at the Philadelphia Naval Shipyard.

(Id.)

Rhoads has been engaged in the metal fabrication business since 1938.   In 2010, it added

a division to provide ship maintenance, repair, and fabrication services at the Philadelphia Naval

Shipyard under the name Rhoads Maritime Industries.   (Id. ¶ 2.)   Rhoads' maritime customers

include Aker Philadelphia, the U.S. Navy, the Army Corps of Engineers, Northrop Grumman,

and Lockheed Marin Corp.   (Id.)   At the Port of Philadelphia, Rhoads used the following

companies to provide tug services in the Naval Shipyard:   Moran, McAllister Towing of

Philadelphia, Inc. ("McAllister"), and Wilmington Tug, Inc. ("Wilmington").   (Id. ¶ 3.)   Rhoads

has also used for towing services Hays Tug and Launch Service, Inc. ("Hays"), K-Sea

Transportation Partners ("K-Sea"), and Kirby Offshore Marine ("Kirby").   (Doc. No. 35 ¶ 3.)

---

[3]   An "allision" occurs when a moving vessel strikes a stationary object.   A "collision" occurs
when two moving vessels strike each other.   Bessemer & Lake Erie R.R. Co. v. Seaway
Marine Transp., 596 F.3d 357, 362 (6th Cir. 2010).

John Gazzola was the General Manager and Vice President of Moran's operation in the Port of Philadelphia from 1999 to August 2010.  (Doc. Nos. 33, 35 ¶ 8.)  In August 2011, Gazzola joined Rhoads.  (Id. ¶ 10.)  He left the company in 2013.  (Id.)  At Rhoads, he held the position of Director and Vice President for Sales, and also served in the capacity of Port Manager.  (Id.)  He was the primary connection between Rhoads and the port community maritime vendors, and he was responsible for directing towage services.  (Id.)

**B.  Rhoads' Use of Moran to Perform Towing Services**

Rhoads used Moran's tug services on eleven occasions from August 24, 2011 to October 29, 2012.  (Doc. Nos. 33, 35 ¶ 12; Doc. No. 33-2, Ex. 9.)  Rhoads requested tug services by calling or emailing Moran.  Moran sent invoices to Rhoads and each one was paid.  (Doc. Nos. 33, 35 ¶¶ 12, 19(f).)  Each invoice was addressed to Rhoads and to the attention of Gazzola. (Doc. No. 33-2, Ex. 9.)  Each invoice referenced Moran's Schedule of Rates, Terms and Conditions.  (Id.)  Specifically, the following notice was printed at the bottom of each invoice in capital letters:

> ALL HARBOR TUG SERVICES ARE RENDERED SUBJECT TO MORAN'S CURRENT SCHEDULE OF RATES TERMS AND CONDITIONS IN EFFECT FOR THE PORT IN WHICH THE SERVICE IS PERFORMED, INCLUDING WITHOUT LIMITATION, TERMS PERTAINING TO LIMITATION OF MORAN'S LIABILITY AND THE NON-PROVISION BY MORAN OF PILOTAGE.  ADDITIONAL COPIES OF MORAN'S APPLICABLE SCHEDULE ARE AVAILABLE ON REQUEST OR MAY BE ACCESSED DIRECTLY UNDER THE SERVICES TAB AT MORAN'S INTERNET WEB PAGE: WWW.MORANTUG.COM.

(Id.; Doc. Nos. 33, 35 ¶ 7.)

The employees of Moran and Rhoads became aware in October 2012 that Superstorm Sandy was going to hit the Port of Philadelphia.  As a result, Rhoads requested tug services from Moran to hold a ship in place.  (Doc. Nos. 33, 35 ¶ 14; Doc. No. 33-2, Exs. 10, 11.)  On October 29, 2012, Nathan Hauser, General Manager and Vice President of Moran's Philadelphia

operation, sent the following confirming email to Gazzola, and attached to the email a copy of Moran's Schedule of Rates, Terms and Conditions:

> Hello John,
>
> Thanks for your order of two tugs for 1800 this evening for the storm "Sandy". We will honor our current agreed rate of $500 per hour for this service.  Per our conversation a fuel surcharge will be applied to this rate for the hours the tug is actively pushing.
>
> Please find attached our published "Schedule of Rates, Terms and Conditions". All services rendered are subject to these terms.
>
> Thanks,
> Nathan

(Id.)  Rhoads did not object to being subject to the Schedule in relation to the Superstorm Sandy job.  (Doc. Nos. 33, 35 ¶ 15.)  The services were rendered, and an invoice was provided in accordance with the invoice practice described above.

Thereafter, on November 8, 2012, Gazzola, on behalf of Rhoads, telephoned Moran and requested that it provide tug services to shift a YD-209 crane barge within the Philadelphia Naval Shipyard on the following day.  (Doc. Nos. 33, 35 ¶ 17.)  Other than this telephone call, there was no paperwork or emails that were immediately sent by Moran to Rhoads.  The next day, on November 9, 2012, Moran performed the services requested by Gazzola.  It dispatched the tug Cape Cod to shift the YD-209.  (Id. ¶ 18.)  During the movement, a section of the crane boom on the barge contacted the overhanging antenna platform of the U.S.S. John Fitzgerald Kennedy twice, causing each to sustain damage.  (Id.)  As a result of this allision, the YD-209 was moved back alongside the bulkhead and the operation was not completed.  (Id.)  Moran did not send Rhoads an invoice for the services provided on November 9, 2012.  (Doc. No. 35 ¶ 7.)

### C.  Moran's Schedule of Rates, Terms and Conditions

As noted, Moran uses a "Schedule of Rates, Terms and Conditions" which is published on its website, located at www.morantug.com.[4]  (Doc. No. 33-1.)  Moran has not changed the terms of its Schedule of Rates, Terms and Conditions for the Port of Philadelphia since January 15, 2009.  (Doc. Nos. 33, 35 ¶ 9.)  To access the Schedule of Rates, Terms and Conditions on Moran's website, a visitor would click through the following links from the homepage:  "Port Information and Rates," the port of interest (here, Philadelphia), and "Rates."[5]  (Doc. No. 33-1.) A document then opens, which is referred to by the parties as the Schedule of Rates, Terms and Conditions (or the "Schedule").  Because the applicability of this document here is the crux of the current dispute, a detailed description is warranted.

The first page of the document contains the Moran Philadelphia logo and contact information at the top, along with the title: "Schedule of Rates, Terms and Conditions" and the notation: "Effective January 15, 2009".  (Doc. No. 33-1 at 8.)  Below the title and date is a double horizontal line across the page which divides the page approximately in half.  (Id.)  Under the double line is the title "TOWAGE AGREEMENT."  (Id.)  Under "Towage Agreement" is a short three-paragraph agreement with blank spaces in which to insert the date and party names, and signature lines.  (Id.)  The agreement essentially states that Moran will provide all towage requirements of the party at the Port of Philadelphia.  (Id.)  It has been referred to as an

---

[4]   As will be discussed, infra, Rhoads argues, among other things, that it is not subject to the Schedule of Rates, Terms and Conditions because the November 8, 2012 oral request for services was independent of any tug services on October 29, 2012 in regard to Superstorm Sandy or any services for the prior occasions when Rhoads hired Moran.  Whether the Schedule and limitation of liability clause applies to the allision on November 9, 2012 is the crux of the dispute here.

[5]   Alternatively, from the main webpage, a visitor may click on "Our Services" and "Ship Docking," to go to the "Port Information and Rates" webpage.

exclusivity agreement, or in accordance with its title, a Towage Agreement.  Specifically, the

Towage Agreement states the following:

> It is hereby agreed between Messrs: _____ (hereinafter called
> "OWNERS") and Moran Philadelphia, a division of Moran Towing Corporation
> (and its successors) (hereinafter called "MORAN") that MORAN will furnish tugs
> for and attend to all the towage requirements at the Port of Philadelphia,
> Pennsylvania, Delaware River and vicinity of vessels owned, managed or
> controlled by OWNERS, and OWNERS agree to place all of their towage
> requirements at the Port of Philadelphia, Pennsylvania and vicinity with MORAN
> in accordance with the current "Schedule of Rates, Terms & Conditions" below, as
> may be amended from time to time.
>
> OWNERS agree that MORAN shall have the right at any time, upon thirty (30)
> days advance notice to OWNERS, to increase its rates or adjust terms and
> conditions, but if OWNERS do not consent to such changes, they may cancel this
> Contract upon fifteen (15) days written notice to MORAN.
>
> This Contract shall remain in force from _____ and shall continue in force
> thereafter from year to year until cancelled by either party giving to the other at
> least thirty (30) days notice in writing prior to the annual expiration date.

(Id.)  As noted, following these terms are lines for signatures by the "Owner" and Moran

Philadelphia.  (Id.)  At the bottom of the first page, the following language is printed in capital

letters:  "IT IS UNDERSTOOD THAT ALL TUG SERVICES PERFORMED BY MORAN ARE

SUBJECT TO ALL THE TERMS AND CONDITIONS SET FORTH IN THE CURRENT

"SCHEDULE OF RATES, TERMS AND CONDITIONS."  (Id.)

The second, third, and fourth pages of the document have paragraphs numbered from 1 to

13, containing rates, terms, and conditions, plus an unnumbered section for "Payment Terms"

and a map.  (Doc. No. 33-1 at 9-11.)  The pages themselves are not numbered.  (Id.)  Paragraph

11 is titled "Limitation of Liability," and states in pertinent part:

> b)  Unless entitled to immunity or to defenses to, exemptions from and limitations
> of liability provided under this Contract or under any applicable law, rule or
> regulation that would reduce their liability to an amount less than that hereinafter
> set forth, Tug Interests shall be liable, only to the extent of their negligence, which
> negligence shall not be assumed but shall be affirmatively proven, for claims,

demands, causes of action, liabilities and costs (including third party claims) arising out of or in connection with any occurrence or series of occurrences related to the provision of tug services pursuant to this Contract up to a maximum aggregate amount of two hundred thousand dollars (U.S. $200,000.00). Owner understands and agrees that tug services provided hereunder are rendered at all times under the supervision and command of Owners' servants, (including the Master of the vessel being assisted and docking pilots), or of State pilots, none of whose actions or inactions may be imputed to the Tug Interests. Owner further understands and agrees that the rates charged by or on behalf of MORAN for tug services are predicated upon the limitations of liability and the indemnities set forth in this Contract. Should Owner desire that Tug Interests retain liability in excess of $200,000.00 it should notify MORAN in writing, whereupon MORAN will quote rates for tug services hereunder predicated on higher liability limits. Any such quote must be accepted by Owner in writing at least twenty-four (24) hours prior to commencement of tug services to the vessel being assisted, failing which the rates and liability limitation otherwise provided herein shall prevail. Nothing herein shall be construed to waive or limit the right of Tug Interests to assert any defenses to liability available to them or to avail themselves of any rights of limitation or exemption from liability under any applicable law, rule or regulation.

. . .

f) Subparagraphs (b) and (d) above shall not apply to dead-ship moves. As used in this Contract, a "dead-ship" is a vessel which has lost the use of its power or steering.

(Id. at 10.)   Rhoads admitted that it was able to find the "Schedule of Rates, Terms and Conditions" on Moran's webpage. (Doc. Nos. 33, 35 ¶ 16.) In addition, Gazzola testified that he was familiar with the Schedule that Moran used while he was employed with Moran, and that he had seen it. (Doc. No. 35-2, Ex. D at 18:12-21.) Moreover, Gazzola testified that it is customary for Moran and other tug companies in the Port to use schedules of rates, terms and conditions as a baseline which were subject to negotiation if the customer desired. (Id. at 18:22 – 19:10.) He testified, however, that he was responsible for operations and rates, and the corporate sales team and legal department were responsible for the legalities of the document. (Id. at 28:14-17, 32:2-25.)

While employed with Moran, Gazzola sent on November 12, 2008 and December 9, 2008, a mass mailing of letters to Moran's then-customers, approximately 500 in number.[6] (Doc. No. 33-1 at 26-27; Doc. No. 35-2, Ex. D at 21:5 – 23:14.)  The letters were not sent to Rhoads because Rhoads was not a customer of Moran at the time.  The November 12, 2008 letter notified Moran's customers that due to increased costs, Moran would be revising its Schedule of Rates, Terms and Conditions for the Port of Philadelphia.  (Doc. No. 33-1 at 26.)  The December 9, 2008 letter stated, "enclosed please find a copy of the revised 'Schedule of Rates, Terms and Conditions' applicable to services provided by Moran Towing of Philadelphia. This Schedule will become effective January 15, 2009."  (Doc. No. 33-1 at 27.)  Gazzola testified that approximately six customers returned a Towage Agreement signed, making them subject to an exclusive dealing agreement, and one customer negotiated different or adjusted terms.  (Doc. No. 35-2, Ex. D at 24:6-15.)  Moran continued to provide services to other customers who did not sign the Towage Agreement or negotiate the terms.  (Doc. No. 35-2, Ex. D at 24:6 – 26:18.)

Rhoads began utilizing the tug services of Moran in August 2011.  (Doc. No. 33-3 at 2; Doc. No. 35-1 at 10.)  On or about August 24, 2011, on behalf of Rhoads, Gazzola negotiated a flat hourly rate of $500 for services provided by Moran.  (Doc. No. 35-2, Ex. D at 50:24 – 52:17.)  No other terms were negotiated.  (Id.)

Gazzola testified that while he was employed with Rhoads, he used Moran, McAllister, and Wilmington for tug services.  (Id. at 20:9-17.)  He further testified that those three tug companies had schedules of rates, terms and conditions which are "available on the internet."

---

[6]   During Gazzola's deposition, he stated, "Out of a thousand tariffs that went out . . ." (Doc. No. 35-2, Ex. D at 24:6-11.)  It is unclear whether the revised Schedule was sent to approximately 500 or 1,000 customers.

(Id. at 20:18 – 21:1 (stating "I can't remember if they actually sent them to me because they're available on the internet."); Doc. Nos. 33, 35 ¶ 13.)

As mentioned, other towing companies in the Port of Philadelphia included McAllister, Wilmington, Hays, Kirby, and K-Sea.  The hard copies of invoices sent to Rhoads from Wilmington, Hays, Kirby, and K-Sea did not contain the specific language of terms or conditions.[7]  (Doc. No. 35-3, Exs. F, G, H, J.)  Wilmington's website, however, contains a "Rate Sheet" comprised of one page titled "Prime Rate Schedule" and one page titled "Terms & Conditions," which contains pilotage and limitation of liability provisions.  (Doc. No. 33-1, Ex. 6.)  Invoices from McAllister to Rhoads contained a notice stating that "all services are rendered subject to our most recently published tariff, available on request or on www.mcallistertowing.com," and that the terms include limitation of liability and pilotage.[8]  (Doc. No. 35-3, Ex. I.)  The tariff[9] located on McAllister's website is similar to Moran's Schedule of Rates, Terms and Conditions.  (Doc. No. 33-1, Ex. 5.)  The first page has the heading "Towing Contract" which similarly contains an exclusive dealing agreement.  (Id.)  The

---

[7]   Rhoads produced copies of the following invoices:  (1) an invoice from Hays for towage services provided on August 20, 2012; (2) invoices dated May 30, 2012, June 29, 2012, August 24, 2012, and September 14, 2012 from Kirby for towage services provided on various dates; (3) invoices dated August 29, 2011, December 29, 2011, January 10, 2012, January 17, 2012, January 30, 2012, February 28, 2012, and March 12, 2012 from K-Sea for towage and other services provided on various dates; and (4) invoices for towage services provided on February 9, 2012 and June 28, 2012 from Wilmington.  (Doc. No. 35-3, Exs. F, G, H, J, K.)

[8]   Rhoads produced copies of invoices from McAllister for towage services provided to Rhoads on August 8, 2011, March 1, 2012, March 26, 2012, June 7, 2012, August 9, 2012, and August 30, 2012, as well as an invoice dated November 21, 2011 for services on an unspecified date.  (Doc. No. 35-3, Exs. I, K.)

[9]   Nathan Hauser testified that the terms "tariff" and "schedule of rates, terms and conditions" are used interchangeably.  (Doc. No. 35-2, Ex. B at 19:6-24.)

next two pages set forth the terms and conditions.  (Id.)  According to the Unsworn Declaration of Rhoads' counsel, as of September 1, 2015 the websites of Hays and Kirby did not contain any rates, terms or conditions.[10]  (Doc. No. 35-3, Ex. L.)

### D.  The Lawsuits Filed as a Result of the November 9, 2012 Allision

As a result of the allision on November 9, 2012, three actions have been initiated.  On October 24, 2014, Rhoads' property insurer, AGCS Marine Insurance Company ("AGCS"), filed a subrogation action against Moran in this Court alleging negligence, breach of contract, and breach of warranty, seeking to recover under Rhoads' insurance policy the amount it paid to Rhoads.  (Civil Action No. 2:14-cv-06075, Doc. No. 1.)  On May 26, 2015, AGCS assigned to Rhoads all of its right, title, and interest in and to any and all claims arising out of its subrogation rights under Rhoads' insurance policy.  (Doc. No. 34.)  On September 1, 2015, the Court granted Rhoads' motion to substitute itself as the real party in interest in the claim of AGCS, and AGCS was terminated as a party in this case.  (Id.)  On November 3, 2014, Rhoads initiated an action against Moran in this Court alleging negligence, and seeking lost revenue and the cost of repairs to the YD-209.  (Civil Action No. 2:14-cv-6335, Doc. No. 1.)

On December 15, 2014, Moran brought the instant action for exoneration from or limitation of liability pursuant to 46 U.S.C. § 30501 et seq. (formerly 46 U.S.C. § 183) and Rule F of the Supplemental Rules of Certain Maritime and Admiralty Claims.  (Doc. No. 1.)  Moran asserts that it is not liable for any losses or damages, but that any liability is limited by the Limitation of Shipowners' Liability Act, 46 U.S.C. § 30505 et seq.  Moran further maintains that Rhoads is bound by the Schedule and the limitation of liability amount of $200,000, and other

---

[10]   K-Sea is now part of Kirby, following a merger which was announced in March 2011, and K-Sea does not have a separate website.  (Id.)

10

limitation of liability provisions within the Schedule.  Rhoads filed an Answer and Claim against Moran on February 20, 2015.  (Doc. No. 13.)

Rhoads' claims against Moran in the instant action are for negligence (Count I) and breach of warranty (Count II).  (Id.)  The claims for negligence against Moran include allegations of negligence, gross negligence, and/or recklessness.  (Id.; Civil Action No. 2:14-cv-6335, Doc. No. 1.)  The two related cases against Moran for property damage have been stayed pending a decision in this limitation action.  As noted, the limitation action has been bifurcated into two phases.  The first phase, at issue here, addresses the applicability of Moran's Schedule of Rates, Terms and Conditions to the tug services which resulted in the allision on November 9, 2012.  In particular, the issue is whether the limitation of liability provision applies, which would limit Moran's liability for negligence to $200,000.  If it does apply, Moran would be entitled to its request for partial summary judgment on this issue.

## III.  STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Montgomery Cnty., Pa. v. MERSCORP Inc., 795 F.3d 372, 376 (3d Cir. 2015); see also Fed. R. Civ. P. 56(a).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013).  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue

of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (internal quotation marks omitted)).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009) (quotation omitted)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247-249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

The nonmoving party may not resist a properly filed motion for summary judgment by relying solely on the unsupported conclusory allegations contained in pleadings, but rather must go beyond the pleadings and affidavits and designate specific facts showing that there is a genuine issue for trial. Id. at 248.  In ruling on a defendants' motion for summary judgment, a mere scintilla of evidence in support of plaintiff's position is insufficient. Id. at 252.  Enough evidence must exist such that a jury could reasonably find for plaintiff. Id.  Plaintiff cannot merely rely upon assertions or speculation. Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).  If the evidence is merely colorable or is not sufficiently probative, summary judgment may be granted. Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 771 (3d Cir. 2009).

IV.    ANALYSIS

A.  The Parties' Contentions

i.  Moran's Motion for Partial Summary Judgment

Moran argues that its Schedule of Rates, Terms and Conditions applies to the claim asserted by Rhoads for damage sustained to the YD-209 crane barge on November 9, 2012 based on custom in the tug industry and because there was a course of dealing between the parties whereby Rhoads had constructive and actual knowledge of the applicability of the Schedule. (Doc. No. 33-3.)  Moran asserts that a course of dealing was established because it provided Rhoads eleven invoices between August 2011 and November 2012 for towing services and each invoice contained the same notice regarding the applicability of the Schedule to all tug services. (Id. at 5-10.)  This course of dealing supplemented the oral agreement made during the November 8, 2012 telephone call between Hauser of Moran and Gazzola of Rhoads for tug services.  (Id.)  Moreover, it was a custom in the tug industry to publish on a website rates, terms, and conditions which applied to every tug job unless a specific agreement is made between the parties that it would not apply or was modified.  Moran argues that neither was done here.

In addition, Moran relies on the fact that Gazzola worked for Moran for over ten years. Therefore, he was familiar with the Schedule used by Moran, he knew it was customary for all tug companies to utilize published schedules of rates, terms and conditions, and he knew that these schedules were available on tug companies' webpages.  (Id. at 10.)  Gazzola was not a "newcomer" to the port, and Rhoads is a sophisticated entity.  (Id.)  As such, Rhoads was aware, or should have been aware, that the Schedule published by Moran applied when it provided tug services.  (Id.)  Moreover, Rhoads admitted that the notice on the invoices was "obvious" and that locating the Schedule on Moran's website was easy.  (Id.)

Moran also asserts that it is irrelevant whether Rhoads actually read the Schedule, because as long as it was on notice of the terms and knew of its location on the website, Rhoads was bound by the terms.  (Id. at 10-11.)  Additionally, Moran provided Rhoads with a copy of the Schedule on October 29, 2012, a short time prior to the November 9, 2012 allision, as a reminder of its applicability.  (Id.)  After October 29, 2012 and even during the course of dealing between the parties, Rhoads never objected to the Schedule, and this constituted acceptance.  (Id. at 12-15.)  Finally, Moran avers that Rhoads is a sophisticated entity and should have known that Moran would not provide towage services based only on an agreement for an hourly rate, and that it would rely on additional terms and conditions including allocation of risks.  (Id. at 15-17.)  Moran argues partial summary judgment finding the Schedule applicable is appropriate.

### ii.   Rhoads' Response in Opposition to Summary Judgment

Rhoads contends that the Schedule of Rates, Terms and Conditions does not apply because there is no course of dealing.  (Doc. No. 35-1.)  Rhoads contends that unless it used Moran as its exclusive tug company, there was no course of dealing that would make it bound by the Schedule.  Had it signed the Towage Agreement, and had the Towage Agreement been in effect at the time of the allision, then Moran would have been its exclusive tug company and the Schedule would have applied.  Because it never signed a Towage Agreement, however, Rhoads contends there was no course of conduct between the parties that would make Moran its exclusive tug company and bind it to the Schedule.  There is no dispute that there was no exclusive relationship between the parties.

Rhoads also claims that there is no evidence of an industry custom that other tug companies do not send copies of their terms and schedules to customers and nevertheless expect that the terms listed on their website apply.  (Id. at 21-23.)

14

Rhoads argues that Moran never provided an invoice related to the tow at issue.  (Id. at 10, 12.)  Rhoads contends that Moran only emailed the Schedule in contemplation of tug services during Superstorm Sandy because it was an "ultra high-risk" engagement, as opposed to their usual short and simple assignments.  (Id. at 12, 19.)  It reasons that if the Schedule applied to all jobs, there would have been no need to send it in connection with the Sandy job.  (Id.)  Correspondingly, Gazzola testified that he read the October 29, 2012 email attaching the Schedule as meaning that "all services rendered for [that] particular service are subject to these terms."  (Id. at 20; Doc. No. 35-2, Ex. D at 64:2-7.)

Even if the Schedule is found to apply, Rhoads argues that the limitation of liability clause does not apply to the YD-209 crane barge because of the ambiguous definition of "dead-ship" in the Schedule.  (Id.)  Rhoads therefore contends that the Schedule with its limitation of liability to $200,000 does not limit Moran's liability related to the allision.

### B.  The Schedule Applies Based on Course of Dealing

It is common in the tow industry for a contract for tug services to be oral, consisting of a telephone call by the tow owner requesting service for the following day, and acceptance by the tug owner, with the remaining terms to be spelled out based on previous dealings.  Sun Oil Co. v. Dalzell Towing Co., Inc., 55 F.2d 63, 64 (2d Cir. 1932).  That is the case here.  "[O]ral contracts are generally regarded as valid by maritime law."  One Beacon Ins. Co. v. Crowley Marine Servs., Inc., 648 F.3d 258, 265 (5th Cir. 2011) (quoting Kossick v. United Fruit Co., 365 U.S. 731, 734 (1961)).  "General maritime law 'stems from the maritime jurisprudence of the federal courts,' and is 'an amalgam of traditional common law rules, modifications of those rules, and newly created rules' drawn from state and federal sources."  One Beacon, 648 F.3d at 262 (citations omitted).  "Under federal common law, general rules of contract interpretation govern maritime contracts."  IAP Worldwide Servs. Inc v. UTI United States, Inc., No. Civ. A 04-4218,

2006 WL 305443, at *7 (E.D. Pa. Feb. 8, 2006).  "These general rules are 'the core principles of the common law of contract that are in force in most states.'"  Id. (internal citations omitted).

A course of dealing is defined as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."  Id. (quoting Restatement (Second) of Contracts § 223(1) (1979)).  "Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.  Evidence of a prior course of dealing can thus establish a party's awareness of a consent to intended contractual terms."  Id. The IAP Worldwide court stated the following regarding course of dealing analysis:

> Ordinarily, a course of dealing analysis focuses on the actions of the parties with respect to a specific issue that the parties may have encountered before, such that a factfinder could reasonably infer that the parties have incorporated such a term in their agreement.  *Step-Saver [Data Sys., Inc. v. Wyse Tech.*, 939 F.2d [91,] 103 [(3d Cir. 1991)].  But, the prior course of dealing doctrine extends "beyond prior dealings involving actual disputes to include evidence that a party has ratified terms by failing to object. Specifically, terms repeated in a number of written confirmations may, over time, become part of later contracts."  *See Quick v. NLRB*, 245 F.3d 231, 247-48 (3d Cir. 2001); *see also Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F.2d 7, 8 (2d Cir. 1989) ("Where, as here, a manufacturer has a well established custom of sending purchase order confirmations containing an arbitration clause, a buyer who has made numerous purchases over a period of time, receiving in each instance a standard confirmation form which it either signed and returned or retained without objection, is bound by the arbitration provision.").  In such cases, "the common knowledge and understanding of the parties . . . may be inferred from . . . tacit acceptance of a clause repeatedly sent to the offeree in an order confirmation document." *New Moon Shipping Co., [Ltd. v. MAN B&W Diesel AG*,] 121 F.3d [24,] 31 [(2d Cir. 1997)].
>
> A course of dealing, rather than modifying an agreement, may become part of an agreement at its inception by "explicit provisions of the agreement or by tacit recognition." U.C.C. § 1-201(b)(3) Official Comment 3.  It reveals the "bargain of the parties in fact," informing the nature and the extent of the parties' obligation to each other.  *See Kunststoffwerk Alfred Huber v. R.J. Dick, Inc.*, 621 F.2d 560, 564 (3d Cir. 1980) (stating that course of dealing may establish a limitation of damages term as part of the bargain of the parties in fact).

Id. at *8.

A course of dealing may also supplement the parties' agreement.  For example, "[u]nder general maritime law, terms and conditions contained in subsequently-issued purchase orders may supplement an oral agreement if there is evidence of a prior course of dealing between the parties from which a court may infer that the parties were aware of and consented to those additional contractual terms." One Beacon, 648 F.3d at 265.  "In construing maritime contracts, [courts] have held that '[w]here parties share a history of business dealings and standardized provisions have become part of those dealings, such familiar provisions within purchase orders issued after performance are binding where they are accepted without objection.'" Id.

Therefore, "[w]here an agreement is silent on a particular term, a course of dealing may fill the void." IAP Worldwide, 2014 WL 305443, at *8.  "This is made clear by the fact that a course of dealing may supplement or qualify the terms of the parties' agreement as well as provide interpretive guidance on terms explicit in that agreement." Id. (citing James v. Zurich-Am. Ins. Co. of Ill., 203 F.3d 250, 255-56 (3d Cir. 2000)).  The following cases are also instructive.

In Stevens Technical Services v. Mormac Marine Enterprises, Inc., the court held that Moran's pilotage clause applied to tug services because the invoice for services, similar to at least nine prior invoices from Moran to Stevens for tug services, set forth the pilotage clause and stated, "[t]he furnishing of tugs to assist in docking, undocking or transporting a vessel is subject to the terms and conditions set forth in our current Schedule of Fares, Terms and Conditions." No. 01 CV 8391, 2004 A.M.C. 2513 (E.D.N.Y. 2004).  The pilotage clause was standard in the industry and Stevens was familiar with the customary use of pilotage clauses because it had received and paid invoices containing the same language on nine prior occasions.  Id. at 2517,

2538.  The pilotage clause was also a provision in Moran's Schedule of Rates, Terms and Conditions, which was incorporated by reference into all of Moran's invoices.  Id. at 2517.

K.K.D. Imports, Inc. v. Karl Heinz Dietrich GmbH & Co. International Spedition is a decision involving maritime shipping.  36 F. Supp. 2d 200 (S.D.N.Y. 1999).  The court held a forum selection clause contained in standard trading conditions of certain agents were deemed to be incorporated into the contract by its reference in prior invoices as part of a prior course of dealing.  Id.  Forty-one prior invoices had been exchanged between the parties, all of which contained a notice stating that "[a]ll business is undertaken subject to the standard trading conditions of the German Institute of Shipping & Forwarding Agents."  Id. at 201.  The court noted that contracts "may validly incorporate by reference terms from other documents or agreements," and that it is "well established that 'evidence of a prior course of dealing may establish a party's awareness of and consent to intended contractual terms.'"  Id. at 202.  The court found that the conditions were incorporated by reference and were applicable, because the plaintiff received the prior invoices and never objected to the terms.  Id. at 203.  It was immaterial that the parties never discussed or negotiated the clause, that the invoices were sent after services were provided, and that the merchant never looked to see what were the standard conditions.  Id.  The merchant's "inattention" could not defeat "reasonable expectations" of the other party.  Id.

In Consolidated Rail Corporation v. M/V Lagada Beach, the court held that a pilotage clause applied to tug services based on the course of dealing consisting of four prior occasions where the parties signed a "ship movement slip" containing the pilotage clause (even though the ship owner claimed it was signed after the accident and the captain did not know the legal significance of his signature on the slip), and based on the general use of pilotage clauses in the

Port of Philadelphia.  1983 AMC 1242, 1245-47 (E.D. Pa. 1982).  In <u>Sea-Land Service, Inc. v. Landis</u>, the court held that a party was bound to contract terms for payment of attorney's fees for collecting unpaid shipping charges, where the terms had been set forth on seventeen invoice-freight bills and bills of lading.  No. CIV. A. 94-6153, 1996 WL 4120 (E.D. Pa. Jan. 3, 1996). There was an established course of dealing between the parties for ten years where the invoices and bills of lading contained this provision, and there was no evidence that the plaintiff contested the terms.  <u>Id.</u>  The court found that prior dealings and the plaintiff's silence proved acceptance of the terms.  <u>Id.</u>

In <u>The Margaret A. Moran</u>, a ship being towed by Moran's tugs hit a pier causing damage to the ship.  57 F.2d 143 (2d Cir. 1932).  The contract for services of the tug had been made by phone.  Moran's schedule of rates containing a pilotage clause had been sent to the ship owner on several prior occasions, and the pier superintendent read it.  <u>Id.</u>  The court found that the pilotage clause applied and was accepted because, over the course of two years, Moran docked forty-two ships for the steamship, the tug charges were pursuant to the schedule, there was no evidence that a different contract or terms were entered into, and the schedule was in general use in the New York Harbor.  <u>Id.</u> at 144.

In addition, <u>Capitol Converting Equipment v. LEP Transport, Inc.</u>, is a shipping case involving machinery that was never delivered.  965 F.2d 391 (7th Cir. 1992).  The contract for services was made by telephone, and an invoice was sent after the shipping took place but before the parties knew the machinery was lost.  <u>Id.</u> at 392.  The bottom of the invoice stated, "see reverse for trading conditions" and the reverse contained nine terms and conditions, including limitation of liability.  <u>Id.</u>  The same terms had been on every invoice throughout the parties' business relationship for years.  <u>Id.</u>  Liability terms were never discussed and an affidavit was

submitted stating that no one employed by plaintiff was aware of the terms.  Id.  Nevertheless, the court found that a course of dealing existed as to limitation of liability.  Id. at 396-97.  The court noted that it was not implying that actual awareness of a particular contractual term is never relevant to course of dealing analysis.  Id. n.6.  But in that case, "alleged unawareness stands alone in sharp contrast to detailed and unrefuted showing of extensive business history." Id.

Most importantly is the case One Beacon Insurance Co. v. Crowley Marine Services, Inc. 648 F.3d 258 (5th Cir. 2011).  It is persuasive authority for the instant case.  One Beacon involved a maritime repair contract between Crowley, owner of a fleet of vessels, and Tubal-Cain, hired to perform work on Crowley's barge.  Id.  During the work an employee of Tubal-Cain's subcontractor was severely injured and insurance coverage was at issue.  Id.  The court upheld the district court's determination that Tubal-Cain breached its contractual obligation to add Crowley as an additional insured.  Id.

Crowley had contracted with Tubal-Cain eight times in the year preceding the job for the repair work, and during each project, Crowley issued a Repair Service Order ("RSO") to Tubal-Cain.  Id. at 263.  The RSOs outlined the scope of repairs, did not include pricing, were not signed, and included the following notice: "THIS RSO IS ISSUED IN ACCORDANCE WITH THE PURCHASE ORDER TERMS & CONDITIONS ON WWW.CROWLEY.COM / DOCUMENTS & FORMS, UNLESS OTHERWISE AGREED TO IN WRITING."  Id.  The terms and conditions located on the website included the insurance and indemnification provisions.  Id.  It was undisputed that the parties never discussed the terms and conditions, Crowley did not provide Tubal-Cain with a hard copy of the same, Tubal-Cain's president testified he never visited the website nor investigated the reference to the terms and conditions,

and the RSO was sent after work had begun.  Id. at 264.  The court found the eight prior jobs created a course of dealing, and the online terms and conditions were incorporated by reference in the contract.  Id. at 269-71.  The court held:

> Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms which show a clear intent to incorporate that instrument into the contract, both instruments are to be construed together.  The incorporation by reference doctrine applies to maritime contracts as well.  Under both general contract principles and admiralty law, a separate document will become part of the contract where the contract makes "clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt."  Terms incorporated by reference will be valid so long as it is "clear that the parties to the agreement had knowledge of and assented to the incorporated terms."  Notice of incorporated terms is reasonable where, under the particular facts of the case, "[a] reasonably prudent person should have seen" them.

> We see no reason to deviate from these principles where, as here, the terms to be incorporated are contained on a party's website.  We note that contracts formed in whole or in part over the internet present relatively new considerations for the courts, and will continue to challenge the courts as the internet plays an increasingly important role in commerce.  However, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."

> We note that other courts, applying traditional contract principles in the non-admiralty context, have expressly or implicitly rejected the very argument that Tubal-Cain makes here, recognizing, for instance, that "internet provisions clearly incorporated by reference [into a purchase order], readily available on the identified internet site, and plainly and clearly set forth therein," are binding even where the party has not read them.  We are persuaded that under admiralty law—which generally follows the common law of contracts in resolving maritime contract disputes—maritime contracts may validly incorporate terms from a website in the same manner that they may incorporate by reference terms from paper documents, and therefore reject Tubal-Cain's argument that the terms and conditions at issue here are unenforceable solely because they were never set down and delivered in paper format.

> The chief consideration when determining the validity of contractual terms—in contracts with or without a nexus to the internet—is whether the party to be bound had reasonable notice of the terms at issue and whether the party manifested assent to those terms.

21

Id. at 267-69 (internal citations omitted).  The court found that the reference on the RSO was clear, the contractor had access to and could reasonably locate the terms and conditions on the website, they were both sophisticated commercial entities, and the fact that they never reviewed the terms and conditions did not negate their applicability.  Id. at 269-71.

With all this guidance in mind, the Court looks to the agreement and the course of dealing between the parties.  It is uncontested that the contract for tug services on November 9, 2012 was made orally by telephone between Gazzola and Moran, and the only term discussed was the rate.  Therefore, the course of dealing must be examined to determine the remaining terms of the contract, if any.  The Court concludes that, based on the course of dealing between the parties, the Schedule was incorporated into the oral contract for towage services.[11]

Crucial to the outcome of this Motion is that the invoices Moran sent to Rhoads, which indisputably were not related to any exclusive arrangement or pursuant to a Towage Agreement, contained a notice stating that the current Schedule of Rates, Terms and Conditions, including but not limited to terms limiting Moran's liability, apply to all tug services.[12]  (Doc. No. 33-2,

---

[11]   Rhoads' claim that the Schedule is an exclusive dealing agreement, or is at best ambiguous, is unavailing.  The Schedule is not ambiguous.  The main title of the document is "Schedule of Rates, Terms and Conditions," which appears above a double line on the first page.  The title "Towage Agreement" then appears below the line and provides for signatures if the exclusive towing agreement is to be executed between the parties.  The fact that there is a separate heading for the Towage Agreement is evidence that it is only one section of the document. The "Schedule of Rates, Terms & Conditions" refers to the entire document, with the Towage Agreement being only one section.  The separate section containing the schedule of rates, terms, and conditions appears on pages two to four.  Rhoads' argument that the Schedule does not apply because the parties did not enter into an exclusive dealings agreement is without merit because the Schedule applied without the necessity of an executed Towage Agreement.

[12]   Specifically, as noted previously, each invoice from Moran to Rhoads stated the following:

ALL HARBOR TUG SERVICES ARE RENDERED SUBJECT TO MORAN'S CURRENT SCHEDULE OF RATES TERMS AND CONDITIONS IN EFFECT

22

Ex. 9.)  Rhoads unquestionably received eleven of these invoices prior to the allision and made payment to Moran pursuant to each invoice.  The Vice President of Rhoads admitted that it was "obvious from the documents that [the notice is] printed [on the invoices.]"  (Doc. No. 33-1, Ex. 2 at 56:13-21.)  Receipt of these invoices put Rhoads on notice that the terms and conditions contained on the Schedule applied to all of Moran's tug services.  The invoice notice does not state that the terms and conditions apply only if the Towage Agreement has been executed. Furthermore, the invoice notice provides that copies of the applicable schedule are available on request or may be accessed on the website.  The reference to the Schedule on the invoices put Rhoads on notice that there were provisions that apply to the tug services, including limitation of liability, and that Rhoads needed to make an inquiry if it was uncertain about the notice on the invoices.  It is telling that no one at Rhoads ever did so or ever requested a copy of the Schedule given the language at the bottom of the invoices.  (Doc. No. 33-1, Ex. 2 at 56:2-12.)

Courts have held that as few as four prior documents containing a term were sufficient to create a course of dealing.  See Consol. Rail Corp., 1983 AMC 1242 (holding four prior occasions created course of dealing); One Beacon, 648 F.3d 258 (eight prior notices created a course of dealing); Royal Ins. Co. v. Sea-Land Serv. Inc., 50 F.3d 723, 727 (9th Cir. 1995) (as few as three or four bills of lading created course of dealing); Stevens Tech., 2004 A.M.C. 2513 (nine prior invoices were sufficient to incorporate by reference the terms).  Therefore, the eleven

---

FOR THE PORT IN WHICH THE SERVICE IS PERFORMED, INCLUDING, WITHOUT LIMITATION, TERMS PERTAINING TO LIMITATION OF MORAN'S LIABILITY AND THE NON-PROVISION BY MORAN OF PILOTAGE.   ADDITIONAL   COPIES   OF   MORAN'S   APPLICABLE SCHEDULE ARE AVAILABLE ON REQUEST OR MAY BE ACCESSED DIRECTLY UNDER THE SERVICES TAB AT MORAN'S INTERNET WEB PAGE: WWW.MORANTUG.COM.

(Doc. No. 33-2, Ex. 9.)

invoices here were sufficient to create a course of dealing in the instant case.  It is reasonable for Moran to have assumed that Rhoads read the notices on the invoices, was aware of the Schedule and its terms, and assented to the Schedule's application to all tug services requested by Rhoads.

Rhoads' silence may be reasonably interpreted as assent to the terms and conditions.  See Morales v. Sun Constructors, Inc, 541 F.3d 218 (3d Cir. 2008) (manifestation of mutual assent relies on what a person is justified in regarding as assent); Sea-Land Serv., Inc. v. Landis, No. Civ. A. 94-6153, 1996 WL 4120, *3 n.8 (E.D. Pa. Jan 3, 1996) (citing the Restatement (Second) of Contracts for the rule that an "offeree's silence or inaction is valid acceptance of a contract where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept"); K.K.D. Imps., Inc. v. Karl Heinz Dietrich GmbH & Co. Int'l Spedition, 36 F. Supp. 2d 200 (S.D.N.Y. 1999) (terms and conditions were incorporated by reference into the contract based on notice of their applicability on invoices; failure to review conditions does not defeat reasonable expectations of other party).  A signed agreement or specific discussion of the Schedule was not necessary under the circumstances to bind Rhoads to its terms and conditions, as evidenced by the cases discussed above.

There are numerous maritime cases involving limitation of liability provisions which show that in ports around the country, it is typical for tug services to be provided pursuant to terms and conditions under circumstances similar to what occurred here.  For example, in Consolidated Rail Corporation v. M/V Lagada Beach, the court noted that pilotage clauses were consistently used in the Port of Philadelphia.  1983 A.M.C. 1242, 1247 (E.D. Pa. 1982) ("The course of dealing between the parties involved and the use of the Pilotage Clause in the Port of Philadelphia makes it operative between shipowners using the port and tugboats operating within the Port.").  Similarly, in Gaida Shipping Corporation v. Tug S/R Mare Island, the court upheld a

24

limitation of liability provision contained in the Standard Terms and Conditions of a towage contract, which limited the tug owner's liability for damages due to their own negligence to $250,000.  No. C 01-4278, 2002 WL 31939082 (N.D. Ca. Sept. 9, 2002).[13]  Moreover, Hauser, the General Manager and Vice President of Moran, testified that it is customary in the industry that every maritime company has terms and conditions, or tariffs, that are published and generally apply.  (Doc. No. 33-1, Ex. 3 at 16:14-21.)

Also critical is the fact that Gazzola had been a General Manager and Vice President with Moran for over ten years.  As such, he was in a unique position to have knowledge of the Schedule.  Gazzola was aware that the Schedule was sent to customers including those who did not have an exclusive dealings relationship with Moran.  Gazzola in fact mailed in December 2008 copies of the revised Schedule of Rates, Terms and Conditions to all of Moran's then-current customers.  Gazzola admitted that it was customary for Moran and other tug companies in the Port of Philadelphia to use schedules of rates, terms and conditions, as a baseline subject to negotiation if desired by the customer.  (Doc. No. 35-2, Ex. D at 18:20 – 19:10.)  Gazzola also admitted that he knew that rates, terms and conditions for Moran, McAllister, and Willington were available on their websites.  At Rhoads, Gazzola was the Director and Vice President for Sales, served as Port Manager, was the primary connection between Rhoads and the port community maritime vendors, and was responsible for directing towage services.

---

[13]  See also, The Margaret A. Moran, 57 F.2d 143 (2d Cir. 1932); Sun Oil Co. v. Dalzell Towing Co., 55 F.2d 63 (2d Cir. 1932); Canarctic Shipping Co. v. Great Lakes Towing Co., 670 F.2d 61 (6th Cir. 1982); Stevens Tech. Servs., Inc. v. Mormac Marine Enter., Inc., 2004 A.M.C. 2513 (E.D.N.Y. 2004); McNamara v. Tug "Diana L. Moran", 87 Civ. 3096, 1989 WL 106522 (S.D.N.Y. 1989); Trinidad Corp. v. S.S. Sister Katingo, 280 F. Supp. 976 (S.D.N.Y. 1967); Enterprise Ship Co. v. Norfolk S. Ry. Co., 185 F. Supp. 2d 622 (E.D. Va. 2001); Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411 (1959); Fed. Steam Nav. Co. v. Tugs Savannah, 305 F. Supp. 1293 (S.D. Ga. 1969).

Rhoads relies on <u>Tankers & Tramps Corp. v. Tug Jane McAllister</u>, 358 F.2d 896 (2d Cir. 1966), to support its position that there is insufficient evidence to establish a course of dealing or that the limitation of liability provision was brought to its attention.  In <u>Tankers</u>, the tug company McAllister claimed it was not liable for a tanker grounding due to pilot error because of a pilotage clause, which appeared below the signature line on the tug assistance slip or receipt signed by the tanker's master after grounding, as well as on the bill which was paid, and on a rate schedule in use at the time.  <u>Id.</u>  There was no evidence the owner of the tanker ever saw the schedule referring to the clause, although the owner's agent had paid prior bills containing the clause.  <u>Id.</u>  The court found there was no proof of prior dealings to justify inference that the terms applied.  <u>Id.</u> at 899.  There also was no evidence regarding custom in the trade, or Tankers' knowledge of the schedule.  The signature on the receipt only confirmed the date and time of tug assistance, and mere payment of a bill by the agent could not demonstrate agreement to a new major limitation.  <u>Id.</u>  The majority indicated willingness to apply a course of dealings analysis, but found there was not enough evidence submitted in the case.  <u>Id.</u>

<u>Tankers</u> is distinguishable because in that case, there was no evidence that the owner ever received notice of the provisions.  Here, Rhoads received eleven invoices referencing the Schedule, and the Schedule was emailed to Rhoads on October 29, 2012.  Moreover, Moran sent the invoices directly to the attention of Gazzola, whereas an agent of Tankers received the bills and slips.

The fact that the Schedule was sent to Rhoads on October 29, 2012 in the email from Hauser is further indication that Rhoads had notice of the Schedule and its terms.  The October 29, 2012 email attaching the Schedule did not state that the Schedule was a special agreement for that occasion only because of Superstorm Sandy.  Rather, the email confirmed that the current

rate of $500 between the parties would be honored and that a fuel surcharge would apply, and stated: "Please find attached our published 'Schedule of Rates, Terms and Conditions'. All services rendered are subject to these terms." (Doc. No. 33-2 at 31.) The email also did not request that Rhoads enter an exclusive dealing agreement, or execute the Towage Agreement, or sign the Schedule in general. Therefore, the email was notice that the terms and conditions applied even absent an exclusivity relationship. Furthermore, the fact that Moran directed Rhoads' attention to the Schedule shortly before the allision supports the notion that Rhoads had knowledge of the applicability of the Schedule and its terms.

### i. Rhoads' Failure to Read the Schedule Does Not Raise an Issue of Fact

It is not dispositive that Rhoads never read the Schedule.[14] In <u>Sun Oil Co. v. Dalzell Towing Co.</u>, a steamship grounded during a tug. 55 F.2d 63 (2d Cir. 1932). The contract for tow was oral, but the tug company had mailed a "Pro Forma Towage Rates and Contract" containing a pilotage agreement to the steamer company on three prior dates, and their invoices also contained the pilotage clause. <u>Id.</u> The marine superintendent testified that he never read the clause. <u>Id.</u> The court found:

> Whether he had actually read the clause and whether it was in his mind when he telephoned the order for tugs for the [steamship] is quite beside the point. The meeting of the minds of the parties to a contract is not determined by a subjective test. [The] offer on behalf of the libellant, which the respondent accepted, must be interpreted in the sense in which the party using the words should reasonably apprehend that they would be understood by the other party. 2 Williston, Contracts § 605. Knowing that the respondent had a schedule of rates and a pilotage clause, the importance of which had been stressed not only in the letter of November 15, 1923, but also by printing it on its billheads, the libellant should reasonably apprehend that its telephone order for tugs would be understood by respondent as a request that they be furnished upon its customary terms as to rates and pilotage.

---

[14]   Gazzola testified that he did not read the Schedule when he received it as an attachment to Hauser's email dated October 29, 2012. (Doc. No. 35-2, Ex. D at 65:1-7.) The Vice President of Rhoads testified that he reviewed the Schedule "in preparation for [the] deposition." (Doc. No. 33-1, Ex. 2 at 55:2-7.)

Id. at 64-65.  The Second Circuit affirmed that the contract between the parties contained the pilotage clause.  Id.; see also One Beacon, 648 F.3d at 270 ("[t]he fact that a party chooses not to review a contract, or terms or conditions, when they had the opportunity does not negate the fact that they are bound by those Terms and Conditions."); Wigfall v. Nat'l R.R. Passenger Corp., Civ. A. No. 91-0914, 1991 WL 193397, *2 (E.D. Pa. Sept. 19, 1991) ("Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that she did not read them.").  Similarly, Rhoads is bound by the terms and conditions contained in the Schedule even if it never reviewed the Schedule.

Rhoads argues the fact that the rate it was charged by Moran is not listed on the Schedule is an indication that the Schedule did not apply.  However, consistent with Moran's position, the parties negotiated the rate, but did not need to negotiate any other terms or conditions because the course of dealing between the parties made the Schedule part of their oral agreement.

### ii.  The Failure of Moran to Send a Follow-Up Invoice After the Allision Does Not Raise a Question of Fact

It is of little consequence that Moran did not submit an invoice to Rhoads for tug services on November 9, 2012.  Because the applicability of the Schedule had been set forth in the prior invoices, a course of dealing was created whereby Rhoads consented to the Schedule's applicability in future orders for tug services.  See IAP Worldwide, 2006 WL 305443 at *8 ("the common knowledge and understanding of the parties . . . may be inferred from . . . tacit acceptance of a clause repeatedly sent to the offeree in an order confirmation"); Caterpillar Overseas, S.A. v. Marine Transp. Inc., 900 F.2d 714 (4th Cir. 1990) (holding that there was a sufficient course of dealing where a bill of lading containing terms and conditions was submitted upon delivery of goods on many occasions; therefore, the terms and conditions were imputed into the contract at issue even though the goods and bill of lading were never delivered at the

time of the accident); Ins. Co. of N. Am. v. NNR Aircargo Serv., 201 F.3d 1111 (9th Cir. 2000) (finding that it was not an issue that the manufacturer did not receive the shipment invoice containing terms until after the shipment took place, because prior receipt of forty-seven invoices all containing the same terms established a course of dealing and was sufficient to presume knowledge of the terms and conditions going forward; the manufacturer could have negotiated the liability coverage terms for the shipment at issue based on this knowledge). The fact that Rhoads received eleven prior invoices all containing notice that the limitation of liability provision applies to all tug services was sufficient to put Rhoads on notice that the same provision would apply to future tug services.

In summary, the eleven prior invoices containing reference to the Schedule created a course of dealing. The online Schedule and limitation of liability provision were incorporated by reference into the contract between Rhoads and Moran. The Schedule and limitation of liability section were clearly identified in the invoice. The Schedule was available on Moran's website and was easily located. Rhoads is a sophisticated party and by never objecting to the application of the Schedule, it manifested its assent to the Schedule's future application.

Moran has presented substantial evidence establishing that the Schedule of Rates, Terms and Conditions applied to the towage services on November 9, 2012 based on the course of dealing between the parties. Rhoads has not set forth specific facts showing any genuine issue of material fact exists on the matter raised in the summary judgment motion. For the foregoing reasons, partial summary judgment is warranted.

### C.  Rhoads' Argument that Even if the Schedule Applies, the Limitation of Liability Provision Does Not Apply

Rhoads raises two additional arguments regarding the application of the limitation of liability provision. First, it argues that the barge move is not covered by the limitation of liability

provision because of the exception for "dead-ships."  Second, it argues that there is no limitation of liability for gross negligence or recklessness.

The limitation of liability section provides that subparagraph (b) and (d) shall not apply to "dead-ship moves."[15]  (Doc. No. 33-1, Ex. 1 at 10 ¶ 11(f).)  A "dead-ship" is defined in the Schedule as a "vessel which has lost the use of its power or steering."  (Id.)

First, the YD-209 barge is a vessel.  The YD-209 barge is a 50-ton floating crane "used to lift and move loads associated with general marine work and within its rated capacity."  (Doc. No. 35-2, Ex. A.)  The crane is "not self-sustaining and must be towed to the worksite."  (Id.)  It is "classified as a C-2 vessel."  (Id.)  Second, the YD-209 barge never had power or steering of its own.  Therefore, it did not lose the use of its power and steering.

---

[15]    Subsection (d) of the limitation of liability provision states the following:

> Owner agrees to indemnify, defend and hold harmless the Tug Interests from and against any and all claims, demands, causes of action, liabilities and costs (including attorneys' fees and third party claims of whatever nature) in excess of the applicable amounts set forth in (b) above that are attributable to the acts or omissions, whether or not negligent, of the Tug Interests, or any of them, or to the unseaworthiness of any tug and which arise out of or in connection with any occurrence or series of occurrences related to the provision of tug services pursuant to this Contract. Except as set forth in subparagraph (f) below, the parties intend for this indemnity to apply in all instances including, without limitation, allision, collision and third party claims. Owner warrants that it possesses sufficient and adequate insurance on the vessels assisted pursuant to this Contract, including hull and machinery, P&I, cargo and pollution coverage to comply with all applicable laws and to respond for any losses arising out of or connected in any way with the tug services provided hereunder, with all rights of subrogation for losses under said insurances waived as to Tug Interests and with Tug Interests entitled to all benefits under said insurances of an additional assured or co-assured, as applicable.

(Doc. No. 33-1, Ex. 1 ¶ 11(d).)  In a footnote in Moran's Memorandum of Law in Support of the Motion for Summary Judgment, Moran notes that the Schedule "included risk allocation provisions that required Rhoads to maintain full and proper insurance coverage for its equipment, including the YD-209, with a waiver of subrogation" under paragraph 11(d) of the Schedule, and "[t]his fostered the salutary purpose of avoiding litigation."  (Doc. No. 33-3 at 3 n.1.)

Despite the clear fact that the YD-209 barge is not a "dead-ship," Rhoads still argues that "dead-ship" should be interpreted to include all vessels "without" power or steering, whether lost or not.  Rhoads relies on definitions of dead-ships from other cases.  See Tidewater Grain Co. v. The S.S. Point Manatee, 614 F. Supp. 29, 32 (E.D. Pa. 1984 (a dead ship is a "ship having no propelling power of its own available"); The S.S. Bellatrix v. Martin, 114 F.2d 1004, 1005 (3d Cir. 1940) ("The Bellatrix was 'dead', that is without power of her own"); Keller v. United States, 557 F. Supp. 1218, 1228 n.15 (D.N.H. 1983 ("The Huddell [a barge] is a 'dead' ship, i.e., without propulsion of her own.").

The cases relied on by Rhoads involved ships which once had their own power or steering.  This is distinguishable because the YD-209 barge never had its own power or steering.  If the definition in the Schedule of a "dead-ship" was a "vessel that *does not have* use of power or steering," then the barge crane likely would fall under that definition.  But the definition in the Schedule is a "vessel which *has lost* the use of its power or steering."[16]  (Doc. No. 33-1, Ex. 1 at 10 ¶ 11(f) (emphasis added).)

Rhoads has not raised a genuine issue of material fact based on the definition of "dead-ship" that would preclude summary judgment.[17]

---

[16] When the term is defined in the agreement itself, there is no need to look to other definitions.  See IAP Worldwide, 2006 WL 305443 at *7 ("If the terms of the agreement are clear and unambiguous, they must be enforced as written.").

[17] Rhoads also argues that the limitation of liability provision does not apply to gross negligence or recklessness.  However, Moran is correct that Rhoads goes beyond the scope of this phase of the litigation.  Whether the limitation of liability provision applies to gross negligence and/or recklessness, or just negligence, is a proper determination for the second phase of litigation when there is full discovery and briefing on this issue.  During the second phase of litigation, the parties may conduct discovery and a determination will be made as to whether the conduct on November 9, 2012 constituted negligence, gross negligence, and/or recklessness.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff Moran Philadelphia, Division of Moran Towing Corporation's Motion for Partial Summary Judgment (Doc. No. 33) will be granted.   An appropriate Order follows.